# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Katherine Dabney,

     Plaintiff,

-V-                                   Case No. 2:04-CV-528
                                        JUDGE SMITH
                                        Magistrate Judge Abel

Ohio Department of Administrative
Services,

     Defendant.

## OPINION AND ORDER

Plaintiff brings this action under the Rehabilitation Act of 1973, 29 U.S.C. § 794, asserting that defendant failed to reasonably accommodate her disabilities in the workplace.  Plaintiff and defendant both move for summary judgment.  For the reasons that follow, the Court grants defendant's motion for summary judgment and denies plaintiff's motion for summary judgment.

### I.  Facts

Plaintiff Katherine Dabney is an individual citizen of the State of Ohio.  Defendant Department of Administrative Services

1

("defendant" or "ODAS") is a statutorily created administrative department of the State of Ohio. Ohio Rev. Code § 121.02(C). Defendant is tasked with providing centralized support services and technical solutions to all State agencies, boards and commissions, as well as local governments and State universities. For example, defendant helps deliver mail and information technology, recruit and train personnel, promote equal access to the State workforce, procures goods and services, oversees State construction projects, provides data and voice transmissions, leases and manages office space, processes payrolls, prints publications and performs a variety of other services. To provide this range of services, defendant is organized into the following five divisions: Equal Employment Opportunity, General Services, Human Resources, Office of Information Technology and the Office of Collective Bargaining.

Plaintiff worked for Flex Temporary Employment Service starting in 1990, and from time to time provided contract services through Flex Temporary to the State of Ohio. On February 26, 1992, Dabney sustained a workplace injury to her neck, chest and mid back, when a filing cabinet fell onto her. (Complaint ¶ 6; Dabney Dep. 14, 30-32). Dabney filed a workers compensation claim, took time off work, and drew benefits in relation to her workplace injury

2

with Flex Temporary. (Complaint ¶ 7; Dabney Dep. 32). Because of her 1992 injuries, plaintiff claims that she had difficulty completing housework, waking up in the early morning, doing her hair, grocery shopping, working on the computer at home and driving her car. (Complaint ¶ 8). But she was only unable to work for about two weeks, before being cleared to return to her normal work duties without restrictions. (Dabney Dep. 33-34).

Defendant hired plaintiff in late 1992.  Plaintiff's initial duties entailed providing administrative support to Deputy Director Booker Tall, including reviewing joint ventures, processing his mail and telephone calls, and assisting with other clerical tasks. (Dabney Dep. 34).

In 1993, Plaintiff moved to a new position within the Construction Compliance Unit of the Equal Employment Opportunity Division ("EEOD") as a construction compliance officer – the same position she holds today. (Dabney Dep. 35-36). The Construction Compliance Unit is responsible for ensuring that state contractors implement and adhere to the State of Ohio's affirmative action program pursuant to O.A.C. §§ 123:2.3 through 123:2.9.  The Compliance Unit issues certificates of compliance under Ohio law, and conducts project site visits and compliance reviews to ensure that

contractors utilize minorities and women in the construction trades. The Unit has responsibilities for construction sites all across the State of Ohio, which requires extensive travel by the Section's compliance personnel. Currently, all of the Unit's employees are centrally located in Franklin County. (Wesley Lee Aff. ¶ 2).

After becoming a construction compliance officer in 1993, plaintiff injured herself while transferring some files, but she did not file a workers' compensation claim regarding this injury. (Dabney Dep. 37). As a result of her injuries from transferring files, plaintiff's chiropractor, Robert Plato ("Plato") restricted plaintiff from filing, prolonged sitting or standing, walking around construction sites and traveling beyond a 50-mile radius. (Complaint ¶ 10; Dabney Dep. 38, 49).  Based upon these medical limitations, Dabney sought an accommodation from ODAS in the form of modified work duties.

From 1993 through 1999, Jacqueline Leisenheimer was defendant's Human Resources Administrator. (Leisenheimer Dep. 5). Leisenheimer was responsible for reviewing and granting Dabney's accommodation request, in conjunction with defendant's ADA coordinator (Victoria Robinson) and plaintiff's supervisor (Hattie Crosby). (Leisenheimer Dep. 6, 10, 20-22, 29-30, 40).  In light of the restrictions suggested by Plato, the ODAS management team in place

4

at that time agreed to modify plaintiff's duties by restricting her travel to a 50-mile radius, not requiring her to visit construction sites to perform field audits, limiting her to six hours' work per day, permitting her to change positions frequently from sitting to standing to walking, avoiding repetitive bending, and not requiring her to lift over five pounds. (Complaint ¶ 11; Dabney Dep. 38-40; Leisenheimer Dep. 27-29).

At the time, the ODAS management team believed that granting Dabney this accommodation was operationally feasible. (Leisenheimer Dep. 23, 29-30, 40). Leisenheimer believed that ODAS would likely continue providing the accommodation as long as it was still needed, appropriate and operationally feasible – meaning that if the circumstances changed, that the accommodation would be revisited. (Leisenheimer Dep. 22, 42).  Plaintiff was permitted to work with these modifications of her duties for almost eight years, starting in 1993, and until she applied for disability retirement in 2001.

In late 2000, a new management team was brought in by defendant to run EEOD.  Mr. Wesley Lee was named the Assistant Deputy Director for EEOD in November 2000, and Mr. Wiley Clodfelder was appointed as Deputy Director for EEOD. (Lee Aff. ¶

5

3; Dabney Dep. 44-45). Lee's responsibilities encompassed directing and evaluating the day-to-day job functions of the EEOD employees, including plaintiff. (Lee Aff. ¶ 3).

In December 2000, Clodfelder and Lee began the process of conducting an operations study and analysis to access the efficiency and effectiveness of each of the division's programming units.  Both supervisory and non-supervisory staff were asked to document their daily activities. (Dabney Dep. 63).  During this process, Lee learned that plaintiff's duties had been modified by the prior management team – a decision that he viewed as a complete restructuring of her job duties. Namely, plaintiff worked only six or fewer hours a day, did not drive more than 50 miles in connection with her job (meaning she never performed tasks that required travel), and she was not required to conduct on-site field audits and assessments due to the hazards of walking around a construction site. (Lee Aff. ¶ 3).  Payroll records show that for the 56 weeks prior to February 2001, plaintiff "worked an average of 17.5 hours per week." (Dabney Dep. 64-65; Dabney Dep. Exh. 4).

Shortly after Lee began asking questions about plaintiff's modified duties in conjunction with the operations study, plaintiff applied for, and on May 1, 2002 began receiving, disability

retirement benefits from the Ohio Public Employees Retirement
System ("PERS"). (Complaint ¶ 12; Dabney Dep. 65; Lee Aff. ¶ 3).
Plaintiff alleges that a payroll officer at ODAS told her she had no
choice but to apply for disability retirement or be involuntarily
separated on the basis of disability pursuant to the separate procedure
described at O.A.C. §§ 123:1-33-01 through 123:1-33-04.3
Leisenheimer explained that the process for involuntary disability
separating an employee requires numerous procedural steps – which
defendant had not undertaken in this case.  Hence, defendant asserts
that plaintiff applied for disability retirement on her own.
(Leisenheimer Dep. 16-17).

     The standards for PERS disability retirement benefits and an
involuntary disability separation ("IDS") are similar.  Both focus on
the employee's ability to perform the duties of his or her present
position.  But because it is involuntary, the IDS standard is modified
by the duty to reasonably accommodate under the ADA,
Rehabilitation Act, and O.R.C. Chapter 4112.

     Once plaintiff retired, she remained off work while receiving
more than one years' disability benefits from PERS. (Dabney Dep.
65).

     On June 19, 2002, based upon the medical recommendation

made to the Board, PERS found that plaintiff was no longer disabled and could return to former employment. (Complaint ¶ 13; Dabney Dep. 66).  PERS does not recognize the medical opinions of chiropractors in determining a member's disability claim; therefore, Plato's opinion that plaintiff still had restrictions was not considered. (Shaeffer Dep. 41;4 Mayer Dep. 1005).  PERS notified defendant of its determination that plaintiff could return to work. (Complaint ¶ 14).

Plaintiff appealed the PERS decision to terminate her disability benefits and the Board's determination that she was no longer physically or medically incapable of resuming her employment. (Dabney Dep. 66; Dabney Dep. Exh 6).  By telephone, plaintiff informed Stephanie Kramer, ODAS ADA Coordinator, and Kathy Stewart, OCSEA Chapter President, that she was appealing the PERS decision to terminate her disability benefits. (Dabney Dep. 72, 113; Mayer Dep. 33). Based upon plaintiff's appeal of the PERS decision and then her reactivation of her workers' compensation claim, Shaeffer and Mayer assumed that plaintiff herself believed that she was not ready to come back to work. (Shaeffer Dep. 39, 49; Mayer Dep. 33-35).

Plaintiff's appeal to PERS was eventually dismissed after an independent medical examination conducted by Timothy J. Fallon,

M.D., on behalf of PERS, concluded that Dabney was not precluded from working for defendant or restricted in her ability to drive an automobile. (Dabney Dep. 86-88; Dabney Dep. Exh 8). Plaintiff and Plato, however, disagreed with Dr. Fallon's assessment and OPERS' determination that she was able to resume working without restrictions or to drive a car. (Dabney Dep. 84-85).

After plaintiff's appeal of PERS' decision to terminate her disability benefits was denied, she had her attorney reactivate her workers' compensation claim from 1992 with Flex Temps so she could begin drawing benefits. (Dabney Dep. 78, 85). The managed care organization administering plaintiff's claim, Gates McDonald Health Plus, referred her to MMD Consulting, Inc. ("MMD"), for case management and rehabilitation services. (Complaint ¶ 16; Dabney Dep. 86).

On September 11, 2003, Ms. Patti Sinclair, Rehabilitation Case Manager with MMD, contacted defendant to discuss whether plaintiff could return to her old position as a construction compliance officer with EEOD. (Complaint ¶ 17; Dabney Dep. Exh 11). It was this e-mail from Sinclair that prompted Shaeffer to examine plaintiff's personnel file for the first time.  (Shaeffer Dep. 11).  To learn more about plaintiff's past employment history with defendant, Shaeffer

reviewed files and spoke with employees in EEOD who worked with Dabney in the 1990's to discover exactly what her duties were, whether some sort of accommodation had been given to her in the past, and the circumstances surrounding the accommodation. (Shaeffer Dep. 12-14).

Shaeffer learned that plaintiff had some previous health related restrictions for which defendant had modified her duties, but that the work environment, work load production standards, accountability and staffing needs at EEOD had been very different then from what she knew them to be in September 2003. (Shaeffer Dep. 14-15, 18-19).

Shaeffer then followed up with Sinclair by sending a copy of plaintiff's written position description. (Dabney Dep. Exh 11).  After Sinclair spoke with defendant, plaintiff was aware that there was a construction compliance position open, but that she had to be cleared to perform the duties before she would be reinstated. (Dabney Dep. 98).

On October 13, 2003, Sinclair faxed a copy of an Ohio Bureau of Workers' Compensation form called a Physician's Report of Work Ability (Medco-14) to Mayer. According to this form, as completed by plaintiff's chiropractor, as of October 8, 2003, plaintiff was

10

limited to: a five pound lifting restriction; no squatting or kneeling; only occasional bending, twisting, turning, or pushing; requiring to change in position every hour with 10-15 minute breaks; avoiding driving distances over 50 miles in a day; avoiding walking on uneven surfaces and construction sites; and limited to working 4-6 hours in one day. (Dabney Dep. Exh 12). Despite these restrictions, Sinclair was still inquiring about plaintiff returning to her construction compliance position with a possible accommodation within these limitations.

Schaeffer and Mayer then telephoned Wesley Lee at EEOD to discuss Sinclair's request that ODAS consider bringing plaintiff back with restrictions.  Schaeffer and Mayer explained to Lee the nature of plaintiff's medical restrictions, discussed the particular job duties of the

construction compliance officer, and identified the essential functions of the position.  Based upon the duties as described in plaintiff's written position description, the following duties were deemed essential to plaintiff's job, in order of their importance: 1) Operate a motor vehicle to travel statewide; 2) Conduct on-site reviews and audit of records maintained by construction contractors; 3) Schedule and conduct interviews of persons associated with or working for the

11

various statewide construction contractors; 4) Use computer and associated hardware/software to compile and analyze information; 5) Prepare, review and approve compliance review reports; and 6) Perform related administrative and record keeping tasks. (See Lee Aff. ¶ 4 and Dabney's incorporated position description).

Together, the three determined that, accepting Plato's restrictions as accurate, plaintiff could not perform the core functions of her position. (Shaeffer Dep. 26; Mayer Dep. 50-51, 84, 117, 136; Lee Aff. ¶ 4). Defendant asserts that it was not operationally feasible to grant Dabney's request for duty modification because doing so would mean that Dabney would not be performing the core functions of her position, and modifying her duties in such a way would unfairly transfer additional workload to her co-workers – making the others pick up her long road trips and field audit responsibilities. (Lee Aff. ¶ 4; Shaeffer Dep. 29-32). Nonetheless, defendant was willing to consider any appropriate accommodation, so long as plaintiff could still perform the essential functions of the position. (Mayer Dep. 55). However, aside from plaintiff's request to reassign many of her core job functions to other workers, plaintiff did not ask for any other accommodation. (Mayer Dep 56).

During this period, Sinclair encouraged plaintiff to look for

12

other employment opportunities. In fact, Dabney felt that she was fit enough to return to some form of employment. (Dabney Dep. 103-04). Plaintiff submitted applications or resumes for over seventy-five different positions and employment opportunities from 2002-2004. (Dabney Dep. 116-17; Dabney Dep. Exh. 13). Plaintiff received only one job offer, a position with the Urban League that she declined. (Dabney Dep. 121). Plaintiff also considered starting her own EEO consulting company, and filed incorporation documents with the Ohio Secretary of State. (Dabney Dep. 120). Also, plaintiff never identified some other vacant position at defendant that she felt she could perform the essential functions of despite her condition.

In late 2003, plaintiff's rehabilitation through workers' compensation ended with a finding that her condition had reached maximum medical improvement. See, O.R.C. § 4123.56 (Dabney Dep. 95-95; Dabney Dep. Exh 10 & 15).

On February 26, 2004, plaintiff sent a certified letter to Allison Shaeffer that for the first time formally sought "reinstatement" to her old position as a contract compliance officer and enclosing medical reports from Padma Tandon, M.D., Psychiatrist (dated January 29, 2004), and Robert Plato, D.C. (dated February 13, 2004). (Dabney Dep. 125-26; Dabney Dep. Exh. 16). According to Dr. Tandon's

13

report, plaintiff was fit and able to return to full-time employment with the recommendation that she gradually transition to full-time status, staring at four hours and progressing to eight hours.  Plato's report limited her to six hours a day, a ten pound lifting restriction and no squatting, kneeling or lifting above her shoulders. (Dabney Dep. 127-29; Dabney Dep. Exh. 16).

Plaintiff disagreed with both Dr. Tandon's and Plato's assessments that she could return to work only with restrictions. Rather, plaintiff believed that she was able to return to work as a construction compliance officer with no restrictions because her pain levels were manageable while taking new pain medication. (Dabney Dep. 129).

Defendant rejected plaintiff's request for reinstatement because of the medical restrictions preventing her from performing the essential functions of her position.  (Complaint ¶ 21; Mayer Dep. 57). On March 17, 2004, plaintiff appealed ODAS' denial of her reinstatement request to the State Personnel Board of Review ("SPBR"), pursuant to O.A.C. § 123:1-33-04(I). (Complaint ¶ 22). The SPBR upheld defendant's decision to deny plaintiff's request for reinstatement.

Defendant explained that plaintiff would be reinstated to her

14

former position as a construction compliance officer only when she could perform the essential functions of her position, either with or without accommodation.  Plaintiff then went back to Plato to get a full release with no restrictions. On March 17, 2004, Plato wrote a letter saying that he had reviewed the construction compliance officer position description, and that plaintiff was physically capable of performing the essential duties of the position. As her physician of record, he released her to return to work. (Dabney Dep. 131; Dabney Dep. Exh 17).  Plaintiff submitted Plato's revised determination on or about March 25, 2004. (Dabney Dep. 132).

Given the change in Plato's view of plaintiff's condition and her ability to return to work (Dabney Dep. 131), defendant decided to refer Dabney for an independent medical examination to assist defendant in making its determination to return plaintiff to her previous position, or if an accommodation would be needed. (Shaeffer Dep. 54; Mayer Dep. 62; Dabney Dep. Exh 18).

The evaluation was conducted on April 21, 2004, by Lewis Seeder, M.D. (Dabney Dep. 133; Dabney Dep. Exh. 19).  A few days later, Dr. Seeder found that based upon his examination "no objective medical condition is present that should preclude her return to the noted work activities on an unrestricted basis." (Dabney Dep. Exh.

15

19).

On May 7, 2004, Allison Shaeffer telephoned and mailed plaintiff a letter welcoming her back to work without restrictions. (Dabney Dep. 134, 152; Dabney Dep. Exh. 20).  Plaintiff  remains employed with ODAS as an EEOD construction compliance officer, with no restrictions on her duties.

## II.  Summary Judgment

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at

16

trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also
Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475
U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must
draw all reasonable inferences in favor of the nonmoving party, and
must refrain from making credibility determinations or weighing the
evidence.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133,
150-51 (2000).  The Court disregards all evidence favorable to the
moving party that the jury would not be not required to believe.  Id.
Stated otherwise, the Court must credit evidence favoring the
nonmoving party as well as evidence favorable to the moving party
that is uncontroverted or unimpeached, if it comes from disinterested
witnesses.  Id.

The Sixth Circuit Court of Appeals has recognized that Liberty
Lobby, Celotex, and Matsushita have effected "a decided change in
summary judgment practice," ushering in a "new era" in summary
judgments.  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1476 (6th
Cir. 1989).  The court in Street identified a number of important
principles applicable in new era summary judgment practice.  For
example, complex cases and cases involving state of mind issues are
not necessarily inappropriate for summary judgment.  Id. at 1479.

17

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Id. (quoting Liberty Lobby, 477 U.S. at 257). The nonmoving party

must adduce more than a scintilla of evidence to overcome the summary judgment motion. Id. It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" Id. (quoting Matsushita, 475 U.S. at 586).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." Id. at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. In re Morris, 260 F.3d 654, 665 (6th Cir. 2001).

### III. Discussion

Plaintiff asserts three claims under the Rehabilitation Act. First, plaintiff alleges that defendant violated the Act by failing to accommodate her disabilities from April 2001 until October 2003.

18

Second, plaintiff avers that defendant violated the Act by failing to offer her another position within ODAS. Third, plaintiff maintains that defendant unlawfully failed to rehire her from October 2003 through April 2004 because it regarded her as disabled.

### A. Reasonable accommodation

Plaintiff contends that defendant was required to continue accommodating her alleged disabilities from April 2001 until October 2003. Defendant argues that plaintiff's first claim is without merit because plaintiff has failed to demonstrate that she was disabled within the meaning of the Act. Defendant also argues that plaintiff's first claim fails as a matter of law because the accommodations plaintiff sought would have eliminated essential functions of the job, and would have required other employees to shoulder the burden of the duties plaintiff would not perform. The Court finds that defendant's second argument is dispositive, and will therefore limit its discussion to that issue.

To prevail on an allegation of handicap discrimination based on failure to accommodate, a plaintiff must establish a prima facie case by showing that: (1) she is an individual with a disability; (2) she is qualified for the position; (3) the agency was aware of her disability;

(4) an accommodation was needed, i.e., a causal relationship existed
between the disability and the request for accommodation; and (5) the
agency failed to provide the necessary accommodation. Once the
plaintiff has presented a prima facie case, the burden shifts to the
employer to demonstrate that the employee cannot reasonably be
accommodated. Gaines v. Runyon, 107 F.3d 1171, 1175-76 (6th Cir.
1997).  Employers are required to provide a "reasonable
accommodation" to qualified employees with a disability. 42 U.S.C.
§ 12112(b)(5)(A). The term "reasonable accommodation" is an
adjustment or modification of the workplace environment to allow a
qualified employee, inter alia, to perform essential functions or enjoy
the benefits and privileges of employment equal to those without a
disability. 42 U.S.C § 12111(9).  A "qualified individual with a
disability" is "an individual with a disability who, with or without
reasonable accommodation, can perform the essential functions of the
employment position that such individual holds or desires."  42
U.S.C.  § 12111(8)

An accommodation of "job restructuring" within the meaning of
the ADA pertains only to the restructuring of non-essential duties or
marginal functions of a job.  Bratten v. SSI Servs., Inc., 185 F.3d
625, 632 (6th Cir. 1999)(citing Benson v. Northwest Airlines, Inc.,

20

62 F.3d 1108, 1112-13 (8th Cir. 1995)).  Essential functions are those which, if removed, would fundamentally alter the nature of a job. Kiphart v. Saturn, 251 F.3d 573 (6th Cir. 2001).

When an employee is unable to prove he is capable of performing the essential functions of a job, even with a reasonable accommodation, he is not entitled to the accommodation. Winfrey v. Chicago, 259 F.3d 610 (7th Cir. 2001). Elimination of essential job functions is not required as a form of reasonable accommodation. Phelps v. Optima Health, 251 F.3d 21 (1st Cir. 2001) (employers are not required to excuse employees from essential functions).

At the time of her accommodation request, plaintiff's physician of record found that she was limited to a five pound lifting restriction; no squatting or kneeling; only occasional bending, twisting, turning, or pushing; requiring to change in position every hour with ten to fifteen minute breaks; avoiding driving distances over fifty miles in a day or on uneven construction sites; avoiding walking on uneven surfaces and construction sites; and limited to working 4-6 hours in one day. (Dabney Dep. Exh 12).  Wesley Lee stated under oath that the following were essential tasks to Dabney's job, in order of their importance:

! Operate a motor vehicle to travel statewide;

21

❗ Conduct on-site reviews and audit of records maintained by construction contractors;

❗ Schedule and conduct interviews of persons associated with or working for the various statewide construction contractors;

❗ Use computer and associated hardware/software to compile and analyze information;

❗ Prepare, review and approve compliance review reports; and

❗ Perform related administrative and record keeping tasks.

<u>See</u> Lee Aff. ¶ 4 and incorporated position description.

The Court finds as a matter of law that prior to October 2003, Dabney was unable to perform the core functions of the construction compliance position.  It was not operationally feasible for the EEOD or ODAS to grant plaintiff's requested accommodation in light of the limitations imposed by her physician.  Under such an accommodation, plaintiff would not be performing the essential functions of her position and would modify her duties in such a way that would transfer additional workload to her co-workers.  Plaintiff's co-workers would all be left to pick up the extra work left by plaintiff's inability to travel across the State to complete on-sight reviews and audits.   The Court therefore concludes that defendant's refusal to accommodate plaintiff as requested did not violate the

Rehabilitation Act.

Plaintiff also argues that defendant was required to continue furnishing the accomodations it provided to her before April 2001. "If an employer chooses for whatever reason to bend over backwards to accommodate an employee, going beyond what is required under ADA, it shouldn't be punished for its efforts. Amadio v. Ford Motor Co., 238 F.3d 919, 929 (7th Cir. 2001); Vande Zande v. Wisconson Dept. of Administration, 44 F.3d 538 (7th Cir. 1995). Courts should not discourage employers from providing accommodations that may be beyond the scope of ADA requirements. Holbrook v. City of Alpharetta, 112 F.3d 1522 (11th Cir. 1997). Hence, an employer's decision to cease making accommodations related to essential functions of an employee's position does not violate the ADA. Id.; Shannon v. New York City Transit Auth., 332 F.3d 95 (2nd Cir. 2003)(citing Gilbert v. Frank, 949 F.2d 637 (2nd Cir. 1991)).

Here, defendant initially chose to provide accommodations to plaintiff that eliminated essential functions of her job. In doing so, it went beyond what the Rehabilitation Act requires. When new management came in, it was not obligated to continue the accommodations.

For the above reasons, defendant is entitled to summary

23

judgment in its favor on plaintiff's first claim.

### B. Transfer to another position

Plaintiff also asserts that defendant violated the Rehabilitation Act by failing to transfer plaintiff to a vacant position. Defendant argues that it is entitled to summary judgment on plaintiff's second claim because plaintiff never identified a vacant position for which she was qualified.

When the accommodation in question is a transfer to an existing position, a plaintiff must show as part of her *prima facie* case that she identified a vacant position and then requested and was denied reassignment to a position for which she was qualified. Burns v. Coca-Cola Enterprises, Inc., 222 F.3d 247, 258-29 (6th Cir. 2000). The court in Burns observed:

> In this case, Burns's failure to request a transfer to a new position for which he was otherwise qualified precludes him from recovering for discrimination under the ADA. In order to establish a prima facie case of disability discrimination under the statute, Burns must show that he requested, and was denied, reassignment to a position for which he was otherwise qualified. Alternatively, Burns could show, which he did not, that he requested and was denied some specific assistance in identifying jobs for which he could qualify.

222 F.3d at 258.

As in <u>Burns</u>, Dabney has never identified a vacant position for which she was qualified to perform the essential functions, nor has she requested to be placed into such a position.  For this reason, defendant is entitled to summary judgment in its favor on plaintiff's second claim.

### C.  Regarded as disabled

Plaintiff further asserts that defendant violated the Act when it failed to rehire her because it regarded her as disabled from October 2003 until April 2004.  Defendant argues that plaintiff has not submitted any evidence showing that defendant regarded her as disabled.

There are two ways in which individuals may be "regarded as" disabled within the meaning of 42 U.S.C. § 12102(2)(C): (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities. <u>Sutton v. United Airlines, Inc.</u>, 527 U.S. 471, 489 (1999).

### 1.  Prior accommodation

Plaintiff contends that defendant's prior accommodation of

25

plaintiff's alleged disabilities give rise to an inference that defendant regarded her as disabled.  Defendant argues that its past accommodation does not give rise to an inference that it regarded plaintiff as disabled.

That an employer provides accommodations to an employee – a variant on the "no good deed goes unpunished" theory – simply does not establish that the employee is "regarded as disabled." Plant v. Morton Int'l, 212 F.3d 929, 938 (6th Cir. 2000). An employer does not necessarily regard an employee as disabled "simply by finding the employee to be incapable of satisfying the singular demands of a particular job." Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 885 (6th Cir. 1996). Also, "regarded as disabled" plaintiffs are not entitled to reasonable accommodations.  Kaplan v. City of N. Las Vegas, 323 F.3d 1226 (9th Cir. 2003)(citing Weber v. Strippit, Inc., 186 F.3d 907, 916-17 (8th Cir. 1999)).

The Court finds that defendant's past accommodation of plaintiff's medical conditions does not demonstrate that defendant regarded her as disabled.  First, plaintiff's apparent inability to perform a particular job does not equate with disability under the Act. Second, to allow such an inference would run counter to the policy of encouraging employers to go beyond the requirements of the ADA

26

and the Rehabilitation Act.

### 2. Application for disability benefits

Plaintiff next argues that defendant regarded her as disabled because it encouraged her to apply for disability benefits. Plaintiff contends that defendant "cannot have it both ways," by arguing on the one hand that it did not regard plaintiff as disabled, but arguing on the other hand that PERS approved plaintiff for disability retirement and that SPBR found that plaintiff could not perform the essential functions of her job. Defendant maintains that encouraging plaintiff to apply for disability benefits does not equate with regarding her as disabled.

That an employer believes that an employee may qualify for disability benefits under a standard that is narrower than the Rehabilitation Act's definition of "disability" is not evidence that the employee is "regarded as disabled" under the Act. Hoskins v. Oakland County Sheriff's Dep't, 44 F. Supp.2d 882, 891 (E.D. Mich. 1999), aff'd, 227 F.3d 719 (6th Cir. 2000). The standards for disability benefits are that the employee cannot perform the essential functions of her job – not a broad range of jobs. See Ohio Admin. Code §§ 123:1-33-02; 123:1-33-12(C).

Given the disparity between the definition of disabled for purposes of state disability benefits and the definition of disabled for purposes of the Rehabilitation Act, defendant's suggestion that plaintiff was qualified for state disability benefits because she was unable to perform the essential functions of a *particular job* does not show that defendant regarded plaintiff as disabled within the meaning of the Rehabilitation Act.  The Court therefore rejects plaintiff's argument on this issue.

### 3. Independent medical exam

Lastly, plaintiff maintains that defendant regarded her as disabled when it required her to submit to an independent medical exam ("IME") before it rehired her in May 2004.

An employer has the right to require mental and physical exams as a precondition to returning to work following an extended medical absence.  Pesterfield v. TVA, 941 F.2d 437, 437-38 (6th Cir. 1991).  The mere act of sending an employee out for a medical exam to determine fitness for duty is not tantamount to regarding that employee as disabled. Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 885 (6th Cir. 1996)(holding that an offer of a paid medical leave of absence does not show that an employee was regarded as

disabled)). See also, Kvintus v. R.L. Polk & Co., 3 F. Supp.2d 788, 796 (E.D. Mich. 1998) (refusing to infer perception of disability from an employer's offer to plaintiff of a paid medical disability leave and noting that "to hold otherwise would unnecessarily inhibit employers from any inquiry regarding the status of behavior on the part of an employee that an employer may perceive as inappropriate for the employment environment").

Defendant received information on October 13, 2003 (Dabney Dep. Exh. 12), and again on February 26, 2004 (Dabney Dep. Exh. 16), that plaintiff's chiropractor still had her under several work limitations, including: limited to four to five hours per day, inability to drive a car more than fifty miles and she was not permitted to walk around a construction site. On March 17, 2004, plaintiff's chiropractor suddenly changed course and opined that she was now "physically capable of performing" the "essential duties" of her position as a contract compliance officer (Dabney Dep. Exh. 12), defendant felt it best to have her examined independently.

On April 26, 2004, Dr. Seeder, the independent medical consultant, found that "no objective medical condition is present that should preclude [plaintiff's] return to the noted work activities on an unrestricted basis." (Dabney Dep. Exh. 19). A few weeks later,

defendant rehired plaintiff without work restrictions. Plaintiff remains in that capacity to this day.

The Court finds that defendant was justified in questioning if plaintiff could return to work based upon the mixed messages of her own medical providers. Once the examining physician verified to defendant that plaintiff was fit to return to work, she was promptly returned to her old position. In these circumstances, the Court concludes that defendant's decision to require plaintiff to submit to an IME does not give rise to an inference that defendant regarded plaintiff as disabled.

For the above reasons, the Court finds that plaintiff has failed to adduce evidence that defendant regarded her as disabled from October 2003 until April 2004. The Court therefore concludes that defendant is entitled to summary judgment in its favor on plaintiff's third claim.

### IV. Disposition

Based on the above, the Court **GRANTS** defendant's summary judgment motion (Doc. 23). The Court **DENIES** plaintiff's summary judgment motion (Doc. 19).

The Clerk shall enter final judgment in favor of defendant, and

against plaintiff, dismissing this action in its entirety with prejudice.

The Clerk shall remove this case from the Court's pending cases and motions lists.

The Clerk shall remove Doc. 23 and Doc. 19 from the Court's pending motions list.

**IT IS SO ORDERED.**


**/s/ George C. Smith**
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**